# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| DENNIS LEE MULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:06CV0183 HEA/AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Dennis Mullins' application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income ("SSI") under Title XVI of the Act, id. §§ 1381-1384f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff applied for benefits on July 30, 2004, alleging a disability onset date of January 1, 2001, due to bulging discs, arthritis, and pinched nerves. Plaintiff was 33½ years old at the time of his alleged disability onset date. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on January 5, 2006, at which Plaintiff was

represented by counsel. By decision dated April 27, 2006, the ALJ found that Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on October 26, 2006. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff challenges the ALJ's determination that Plaintiff's impairments did not meet the requirements for a deemed-disabling impairment listed in the Commissioner's regulations. Plaintiff also argues that the ALJ erred by failing to elicit the testimony of a vocational expert ("VE") in determining that Plaintiff was able to work, and by failing to properly consider Plaintiff's pain and his subjective complaints. Plaintiff asserts that ALJ did not like him, as evidenced by the ALJ's failure to ask him any questions at the evidentiary hearing. Plaintiff asks that the decision of the Commissioner be reversed and that the case be remanded for further consideration.

### Work History and Application Forms

The record indicates that Plaintiff earned under $10,000 annually from 1994 through 2004, with the exception of 1997 and 1998 in which he earned slightly over $10,000. Plaintiff had no earnings in 2005. Id. at 93, 97. The Work History Report submitted with Plaintiff's application for disability benefits indicated that he worked as an automobile glass installer in 2003 and 2004, and at various unskilled jobs in other years. Id. at 128-35. The record indicates that for the third quarter of 2004 and first

quarter of 2005 Plaintiff received unemployment benefits in the amounts of $670 and $1764, respectively.  Id. at 102.

A letter dated December 19, 2005, from an auto body and glass company stated that Plaintiff worked there from June 2003 until August 2004, during which period he missed one to three days per week on average due to back problems.  Id. at 117.

In his Function Report submitted on September 3, 2004, in conjunction with his application for disability benefits, Plaintiff, who lived in a mobile home (with his wife and 16-year old son), wrote that he spent much of his day watching TV sitting and lying down intermittently; had difficulty sleeping due to pain; mowed his yard with a weed eater once every two weeks, taking a lot of breaks; could drive, but not as much as needed because it was hard to sit in one place; sometimes walked to visit his mother "on the trail"; went to town about once a month; and had "ok days" and bad days.  Plaintiff indicated that his back pain affected his ability to do many physical activities such as lifting and bending, and that he was in pain even on medication.  He could walk less than one quarter of a mile before he needed to rest.  In addition he had panic attacks, such as when his son did not get home on time.  Id. at 177-84.

**Medical Record**

The earliest medical report in the record is from February 18, 2002, when Plaintiff was seen at a clinic by Michael P. Toney, D.O.  Dr. Toney reported that Plaintiff had a history of recurrent back problems every few months which was exacerbated by moving a large number of boxes weighing a total of 500 pounds five days earlier.  Plaintiff reported

that he was working three jobs.  He told the family nurse practitioner that he had broken

his neck in seventh grade.  On examination, Plaintiff was slow to rise from his chair.  He

had marked paravertebral muscle tightness to the left of the lumbar spine and tenderness

in this area.  Dr. Toney's impression was acute lumbar strain with muscle spasms, history

of fractured neck, and recurrent back problems with the possibility of disc disease.  He

was prescribed Flexeril (for a muscle spasm), Ibuprofen, and Tylenol #3.  Tr. at 338-39.

At a follow-up visit on March 12, 2002,[1] Plaintiff reported that Flexeril made him

hateful and moody, so he stopped taking it.  Tylenol #3 made him on edge.  On

examination, Plaintiff was slow to rise from his chair.  He had some marked paravertebral

muscle tightness in the lumbar spine and low thoracic region, and was somewhat tender

to the left of the lower lumbar spine and left piriformis region.  Dr. Toney's impression

was to suspect musculoskeletal and acute and chronic lumbar sprain/strain, and to

consider underlying disc disease.  Flexeril and Ibuprofen were discontinued, and Soma

was prescribed (for muscle spasm).  Id. at 337.

On March 15, 2002, an MRI of the lumbar spine revealed a broad-based central

disc protrusion at L4-5, with effacement of the anterior thecal sac, mild encroachment of

the neural foraminal bilaterally, and diffuse disc bulges at L2-3 and L4-5, with mild

effacing of the anterior thecal sac.  Id. at 343.

---

[1]    The month and day of this follow-up visit is not clear on the copy of the medical
notes in the record.  The date noted is taken from the ALJ's decision.

On follow-up with Dr. Toney on March 21, 2002, Plaintiff reported some improvement with Soma, but that he still had problems with walking and pain. The impression was suspicion of lumbosacral strain and probable disc disease. Id. at 336. On follow-up on April 2, 2002,[2] Plaintiff reported that his pain was different, and that it was worse first thing in the morning. He had pain to his knee, his arms were weak, he had decreased energy, and he was not sleeping well. Flexeril was again noted. Id. at 335.

Neurologist Ling Xu, M.D., saw Plaintiff on May 14, 2002. On a patient questionnaire, Plaintiff stated that he had chest pain, high blood pressure, ringing in the ears, neck pain, imbalance/coordination, trouble with speech/comprehension, paralysis/weakness of arms and legs, persistent numbness or tingling, shortness of breath with a 20-year habit of smoking one and one-half to two packs of cigarettes per day, a herniated/slipped disc, fractured bones, fatigue (easily), skin problems, unexplained loss of energy or strength, as well as severe depression and mood swings. Plaintiff reported he was using Carisoprodol (a muscle relaxant). Id. at 377-78.

Plaintiff told Dr. Xu that his back pain, which he had experienced intermittently for the past 25 years, began getting worse about five months prior to his visit, radiating to his legs, and that he had neck pain, occasionally radiating to his left arm. Plaintiff reported a 30-pound weight gain in the past 18 months, blurred vision, chest pain, shortness of breath, and mild depression. He was unemployed. On examination, his

_____

[2]    See n.1 above.

memory, attention, concentration, speech, and language were within normal limits. His motor function was full and equal, except in his left quadriceps - limited by pain. There was decreased pinprick sensation on the left at the L3-4 level. Plaintiff walked without support. Dr. Xu's impression was lumbar radiculopathy, and he prescribed a trial of Neurontin. Id. at 379-83.

On August 13, 2002, lumbosacral and cervical spine x-rays were negative, however the inferior aspect of C7 was obscured. Id. at 373-74. An MRI conducted on September 23, 2002, showed degenerative disc disease/degenerative joint disease at multiple levels with mild to moderate stenosis. Plaintiff did not go for an epidural steroid injection due to a fear of needles. The assessment was lumbar spine radiculopathy, and the medical notes indicate that Plaintiff was on Baxtra and Neurontin. Id. at 371.

By letter dated September 24, 2002, to Dr. Toney, Dr. Xu concurred with the diagnosis of degenerative disc disease and degenerative joint disease in the lumbar spine, mostly at L3-4, L5-5, with neural foraminal narrowing and mild to moderate spinal stenosis. Dr. Xu noted that the recent x-rays were negative and an electromyogram/nerve conduction study revealed no evidence of lumbosacral radiculopathy or neuropathy in the left lower extremity. Plaintiff's blood work was normal. Dr. Xu reported that on examination, Plaintiff had a positive straight leg raising test in both legs (indicating lower back pain), and walked with a cane. Plaintiff was taking Bextra and Neurontin, but could not tolerate a higher dose of Neurontin due to drowsiness. Dr. Xu's impression was lumbosacral radiculopathy of the left lower extremity. Id. at 369-70.

On October 29, 2002, Plaintiff was seen at a pain management center by Craig Calhoon, M.D., and Hagop M. Tabakian, M.D., for lower back pain. Plaintiff reported that he was a high-school graduate. He reported that "prolonged" walking and activity aggravated his pain and that he had occasional radiation to both legs. He had sharp pain, which he rated at six on a ten-point scale, noting that some days were better and some days worse. Plaintiff reported taking Neurontin, Bextra, and Skelaxin. On examination, Dr. Tabakian noted positive straight leg raises bilaterally, with some pain elicited with a right lateral bend. There was some myofacial tenderness in the L5-S1 lower back with some facet or sacroiliac joint tenderness at L4-L5. Plaintiff received an epidural steroid injection that day and tolerated it well. Id. at 357-61.

Dr. Tabakian saw Plaintiff again on November 26, 2002. The diagnosis was degenerative lumbar disc disease, spinal stenosis, bilateral facet joint arthropathy, and leg length discrepancy. Plaintiff reported that his epidural injection helped "tremendously" for about three weeks, but that he was having slightly more pain in the past week, although less than what was experienced prior to the injection. A second epidural steroid injection was administered, and Vicodin was prescribed. Id. at 355-56.

On follow-up with Dr. Toney on November 29, 2002,[3] Plaintiff reported that as a youth, he was told that his left leg was shorter than the right, and that he had special shoes built up. When Dr. Toney checked Plaintiff's leg length, his left leg appeared longer than

---

[3]    See n.1 above.

7

the right. Dr. Toney noted that possibly, Plaintiff's low back pain was due to having one shorter leg. Id. at 333.

Dr. Tabakian saw Plaintiff again on January 6, 2003. Plaintiff's diagnosis was unchanged. Plaintiff rated his pain as seven on a ten-point scale. He reported that he had gotten good relief for about four to five weeks (presumably from his epidural steroid injection on November 26, 2002), but that in the week prior to his visit, the pain had worsened, and a knot on the left side of his back had been bothering him recently. On examination, the knot turned out to be the sacroiliac joint, and Dr. Tabakian believed the problem was probably due to leg length discrepancy and a slight limp. Plaintiff received a third epidural steroid injection that day. Id. at 350.

January 8, 2003 x-rays of the lumbar spine in the standing position were essentially unremarkable. An x-ray of the pelvis was negative. Id. at 342. On January 9, 2003, Plaintiff's wife reported by phone that Plaintiff felt better. Id. at 345. A February 20, 2003 bone length study revealed that Plaintiff's right leg was shorter that his left leg by about 11/16 of an inch. Id. at 340-41. On February 21, 2003, Plaintiff elected to use a right shoe lift, which he received on March 12, 2003. On his return to the clinic on April 11, 2003, Plaintiff was happy with the work performed. Another 1/4 inch was added to the original insert, as ordered by Dr. Toney. Id. at 302-05.

On July 21, 2003, Plaintiff was seen by Andrew Gayle, M.D., for left shoulder and elbow pain resulting from a five-foot fall three days earlier. On examination, Plaintiff exhibited full strength, but a very limited range of motion in the left arm, shoulder, and

elbow.  The diagnosis was shoulder strain and elbow pain, and Plaintiff was limited to light duty work, with no use of the left arm, for one week.  Flexeril was prescribed.  Id. at 257-58.  X-rays of the left shoulder showed some deformity of the acetabulum, suggestive of developmental changes or remodeling after an old trauma, but were otherwise unremarkable.  X-rays of the left elbow were within normal limits.  Id. at 256.

The next medical report in the record is from approximately eight months later.  On April 7, 2004, Plaintiff told Dr. Toney that he had recently picked up a "rock," resulting in left shoulder and neck pain.  Tenderness and muscle tightness was noted in this area.  Dr. Toney's impression was paravertebral muscle strain/sprain to the left of the upper thoracic region.  Id. at 331.

On April 27, 2004, Plaintiff saw Dr. Gayle with complaints of mid-back pain and neck pain for two days, beginning after Plaintiff used a power washer.  Dr. Gayle noted Plaintiff's history of back problems, and also that Plaintiff complained of increased anxiety and stress.  A musculoskeletal examination revealed full strength and normal range of motion, and tenderness to the left mid-back and left neck.  The diagnosis was anxiety and back strain.  Ibuprofen, Flexeril, and Zoloft were prescribed.  Id. at 295-96.  Thoracic and cervical spine x-rays were within normal limits.  Id. at 297.

Plaintiff returned to Dr. Gayle on June 8, 2004, complaining of mid-low back and neck pain after lifting a heavy box two days earlier.  He denied muscle weakness.  A musculoskeletal examination again revealed full strength and normal range of motion.  There was tenderness in the cervical spine and left paraspinal muscles and in the lumbar

spine and bilateral paraspinal muscles. The diagnosis was neck strain and lumbar strain, and Skelaxin and Naprosyn were prescribed. Id. at 293-94.

On July 16, 2004, Plaintiff was fitted for orthodics for heel elevation. He was listed as self-employed. Id. at 290-91. At a follow-up with Dr. Gayle on July 24, 2004, Plaintiff complained of swelling and numbness in his hands and said that he was "stressed, nervous, [and] anxious." Dr. Gayle noted bilateral knee tenderness, and diagnosed acute anxiety/depression and osteoarthritis. Plaintiff was prescribed Ativan, Paxil, and Ibuprofen, with Flexeril discontinued. Id. at 247-48. On follow-up on August 9, 2004, Plaintiff complained of pain in the lower back, left shoulder, and left upper back pain for one week that worsened with deep breathing and moving his neck. He denied any recent injury. There was some pain in his left chest and swelling in his left arm and hand. On examination, there was tenderness in the midline cervical and lumbar spine and near the left scapula. The diagnosis was chest, neck, and back pain. Darvocet was prescribed. Id. at 244-45. Cervical spine x-rays were "stable," but suggested some minimal narrowing of the C6-7 disc space. Id. at 246.

An August 12, 2004 MRI of the cervical spine revealed mild spondylosis and mild left foraminal stenosis at C3-C4. Id. at 240. An MRI of the lumbar spine revealed multilevel discogenic and degenerative joint disease of mild to moderate severity at L2-L3 and L5-S1 and of moderate to marked severity at L3-L4 and L4-L5. Id. at 238-39.

Plaintiff returned to Dr. Gayle on August 16, 2004, reporting that he had had a panic attack that morning and was not sleeping at night. Dr. Gayle diagnosed anxiety,

panic disorder, and insomnia, and prescribed Ambien.  Id. at 236-37.  On August 17, 2004, Dr. Gayle noted that Plaintiff's stress test was "suboptimal," but that there was no evidence of ischemia.  His chest pain continued, but was occasional, fleeting, and not severe.  The diagnosis was degenerative joint disease of the cervical and lumbar spine, and chest pain.  Plaintiff was taking Ativan, Darvocet, Ambien, Paxil, and Ibuprofen.  Id. at 234-35.  At a follow-up visit on August 30, 2004, Plaintiff reported intermittent chest pains and unchanged back pain; the diagnosis was degenerative disc disease of the lumbar spine and chest pain.  Id. at 232-33.

In a Report of Contact dated September 20, 2004, a disability counselor noted that Plaintiff reported that Darvocet was not sufficient to deal with his pain and that he was going to try to see Dr. Gayle again for more powerful medication.  He stated that all his activities were limited and that he could only do something for a few minutes before needing to rest.  Plaintiff also reported that he was anxious about driving in heavy traffic because he worried about the other drivers, but he stated that he did not feel the need for counseling and that the reason he could not work was his back problem.  Id. at 122.

On September 21, 2004, Plaintiff complained to Dr. Gayle of joint pain all over, unrelieved by Darvocet.  His neck, back, and hips were affected the most.  The diagnosis was multiple joint pains, bilateral hip pain, and chronic back pain.  Id. at 228.  X-rays of the hips revealed minimal osteoarthritic changes.  Id. at 227.

Chul Kim, M.D., examined Plaintiff on September 30, 2004.  Plaintiff's chief complaint was back problems.  If he turned his neck, the back of his neck became painful.

He reported that for about three years, he had intermittently used a cane, but currently used it all the time for balance. Without the cane, he stumbled easily. He told Dr. Kim that he could stand 15 minutes, walk 1/4 of a mile with a cane, lift up to 15 pounds, sit for 10 minutes, and drive up to 35 miles. In addition, at times he had some hip and knee pain. At the time, Plaintiff was taking Darvocet, Neurontin, Paxil, Ambien, and Naproxen. Plaintiff reported that his last job was in August 2004. Plaintiff reported that he had headaches and dizziness at times, that his left ear hearing was not good, that he had slight chest discomfort at times, and that he became short of breath when walking. On examination, Plaintiff was described as moderately developed and obese. He was in no acute distress when sitting, but complained of back pain with exertion. There was limited range of motion with pain in the cervical spine and lumbar spine and tenderness in the back of the neck and lower back, but no paralumbar vertebral muscle spasm. Plaintiff's gait was very slow with gross limp with a cane. Without the cane, his gait was even slower. He could bear full weight on either leg for a few seconds, but could not walk on heels and toes well. Squatting was very limited. Plaintiff got on and off the exam table without too much difficulty, but had problems lying down and raising up from the lying position. His handgrip and fine finger movements were normal. There was moderate decreased cold sensation in both legs and decreased pain sensation on the right leg. Otherwise, his motor, reflex, and muscle mass were unremarkable. The impression was chronic neck pain, chronic low back pain, obesity, and exertional dyspnea (shortness of breath) probably due to obesity. Id. at 284-87.

12

Consulting physician Donald E. Edwards, M.D., completed a physical RFC assessment form on October 20, 2004, indicating that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry ten pounds, and stand/walk and sit with normal breaks for about six hours in an eight-hour work day. Plaintiff's ability to push and/or pull was unlimited. Dr. Edwards based his conclusion on Plaintiff's alleged pain in his neck and lower back, and his unequal leg length. Dr. Edwards noted that Plaintiff was able to drive up to 35 miles, leave home, care for his personal needs, and do some household work and lawn work, although Plaintiff walked with a limp and a cane (but not necessarily for all activities). Dr. Edwards cited Plaintiff's obesity, at 5' 10" and 245 pounds. Dr. Edwards opined that Plaintiff had medically determinable impairments of moderate to severe degenerative disc disease, and osteoarthritis of the cervical spine. He could frequently climb a ramp or stairs; and occasionally balance, stoop, kneel, crouch, and crawl. Plaintiff was unlimited by extreme cold, extreme heat, wetness, humidity, noise, fumes/odors/dusts/gases/poor ventilation, and hazards (machinery, heights, etc.); but should avoid concentrated exposure to vibration which could aggravate his symptoms of degenerative disc disease. Dr. Edwards found Plaintiff's allegations "largely credible." Tr. at 144-151.

On October 21, 2004, consulting psychologist Marsha Toll, Psy. D., completed a Psychiatric Review Technique form indicating that Plaintiff had no medically determinable psychiatric impairments. Id. 152, 164.

On a November 23, 2004 follow-up with Dr. Gayle, Plaintiff reported continued, unchanged, daily low back pain. On examination, he exhibited full strength. His lumbar spine was tender to palpation midline. The diagnosis was back pain. Id. at 220-21.

Dr. Gayle completed a Medical Source Statement on November 23, 2004, which indicated that Plaintiff could lift and/or carry ten pounds frequently and 20 pounds occasionally; stand and/or walk continuously for 30 minutes; stand and/or walk for four hours in an eight-hour workday; sit continuously for two hours (without a break) and for six hours (with usual breaks) in an eight-hour workday; push and/or pull (including operation of hand and/or foot controls) with limitation; occasionally climb, balance, stoop, kneel, crouch, and crawl; and frequently reach, handle, finger, and feel. Id. at 282-83.

In medical notes dated January 31, 2005, Dr. Gayle reported that Plaintiff's back pain was unchanged. Plaintiff's listed medications were Neurontin, Naprosyn, Ambien, and Darvocet. Id. at 218. At an April 7, 2005 follow-up visit, Plaintiff complained of severe low back pain for a week's duration, after he felt a pop in his back. Pain radiated into his legs, with numbness in his left thigh. He had little relief from Darvocet. On examination, Plaintiff exhibited full strength with no palpable spasm. There was tenderness at the midline lumbar spine and left sacroiliac area. Straight leg raising was positive on the left. Id. at 216-17. Lumbar spine x-rays showed spondylosis, but no acute fractures or subluxations. Id. at 215.

On May 3, 2005, Plaintiff saw Yuli Soeter, M.D., and Debra Russell, F.N.P., at a pain clinic. He arrived with his wife and reported that he was seeking disability. Plaintiff

appeared older than his stated age (Plaintiff was then almost 38), but was alert, cheerful, cooperative, and in no acute distress. He walked with a cane. A musculoskeletal examination revealed moderate tenderness to palpation at L4-5 with full motor strength in the lower extremities. Straight leg raising was negative bilaterally, however Plaintiff complained of low back pain upon straight leg raising maneuver. There was decreased sensation to light touch at right calf. The assessment was low back pain with lower extremity radicular pain symptoms, lumbar disc displacement, and lumbar stenosis. Id. at 268-69. Plaintiff returned to the clinic on May 9, 2005, for an epidural steroid injection. Id. at 267. On May 23, 2005, Plaintiff reported having significant relief for about one and one half to two days, but that the pain returned after the third day. On examination, there was minimal tenderness to palpation of the lumbar spine. The assessment was unchanged, and he was given another epidural steroid injection. Id. at 262-64.

On June 15, 2005, Dr. Gayle noted Plaintiff's weight gain of 50 pounds since January 2005, with a current weight of 275 pounds. Id. at 205. Plaintiff returned on June 18, 2005, regarding elevated thyroid and cholesterol levels on his last lab results. He reported daily neck pain radiating to his right ear and facial area beginning several months earlier, after the spinal injections. The diagnosis was hyperlipidemia, hypothyroidism, and headache. Suggested treatment included diet and exercise for cholesterol, and Synthecid. Id. at 203-04. On follow-up on July 19, 2005, Plaintiff's main complaint was fatigue. His medication seemed to help initially, but his fatigue was worse. The diagnosis was hypothyroidism and fatigue. Id. at 201-02.

## Evidentiary Hearing of January 19, 2006

Plaintiff testified, in response to questioning by his attorney, that he was 38 years old, had a ninth grade education, was roughly 5'10", and weighed about 270 pounds.  He stated that he could read and write, although his hand would sometimes twitch when he wrote.  Plaintiff resided in a mobile home with his wife and 17 year old son.  He could drive, but only drove "once in a while" to a distance about 45 miles from his home.  (Tr. at 36-38.)

Plaintiff testified that his most recent job, which lasted for about a year and a half, was "glass work," later explained as installing windshields in automobiles.  He testified that before that job, he owned his own such business for about one year, noting that he "really enjoyed the glass work."  During his most recent employment, he missed work due to back pain, and he finally quit in August 2004 because he could no longer do the work.  Other prior jobs included working for a tire company for a period of six months, and working for his parents as a cashier at a grocery store.  Plaintiff testified that he did not feel he could perform any kind of work due to his back condition.  Id. at 38-40.

Plaintiff testified that he was taking Darvocet, Naprosyn, Neurontin, and some aspirin and in the past had had spinal injections and physical therapy.  He stated that the injections did not work, and that he decided not to continue with them after he had to lie down for about 45 minutes before being able to leave after a treatment session.  Plaintiff stated that physical therapy had made the pain worse.  He testified that his back condition was the only impairment that was preventing him from working.  His back "took all his

time" -- he had to walk and sleep a "certain way" due to his back pain, which had started

in his lower back, but had spread to his whole back and into his neck.  Id. at 40-41.

Plaintiff testified that he broke his neck in the seventh grade and had had back pain

off and on since then, but had "steady" pain for the last seven to ten years.  He continued

to work until August 2004 "even in pain," but the pain got worse in the past two and-a-

half to three years.  When the pain "flared up," it would shoot down his legs and affect his

arms.  Plaintiff stated that it was a "constant" pain, which he assessed as a seven in

severity on a scale of one to ten.  But he also stated that he never knew when the pain was

"going to happen," and that his medications eased the pain.  Id. at 42-43.

Plaintiff's attorney commented that Plaintiff was walking with a cane, and Plaintiff

testified that he also did so, as he needed the cane to help him with his balance and the

"pain of walking."  When asked why he could not just "grit his teeth" and bear the pain

and work, Plaintiff stated that there was no way he could, because he never knew when "it

was going to go out" and that if it did while he was carrying a windshield, he could drop

it.  He added that it hurt "tremendously" to lift anything.  Id. at 43-44.

Plaintiff testified that he could walk for approximately 100 feet before having to sit,

and could sit for seven to ten minutes before he had to stand.  At that point in the hearing,

Plaintiff got up to stand from his seated position.  He testified that he could stand for "a

little while" if he were leaning on something, but if he were free standing he could only

stand for ten minutes at a time.  He was not able to bend down and touch his knees, and it

was very hard for him to stoop down and get back up.  He stated that he could pick up and

carry 15 to 20 pounds at the most, and that he needed to carry things directly in front of him, as he could not twist his body sideways to pick up or put things down. He had trouble pushing a grocery cart, as it tended to get away from him and move faster than he could walk. He also stated he could not pull things, and that his hands went numb at least once every two days for a period of two to four minutes at a time, during which time he could not hold anything. Id. at 44-47.

Plaintiff testified that he would wake up between 6:00 and 7:00 a.m. and go to sleep between 9:00 and 10:00 p.m. During the day he would walk to his mother's house, and spend time sitting or laying down watching TV. He laid down approximately seven to ten times per day for seven to ten minutes at a time. He used to play pool all the time and go fishing, but could no longer do these things. Plaintiff testified that he had "labored breathing" sometimes and attributed this to his smoking habit (one to two packs a day) and to the way he walked. At this point in the hearing, Plaintiff sat down again. He testified that he could dress himself and take care of his personal needs. He could not vacuum and did not perform household chores or do grocery shopping, but he did use a weed eater on his property for approximately seven to ten minutes each time, before needing to rest. Most of the day he watched TV, and tended to his back, adding, "I really do have to watch what I do." Id. at 47-50. The ALJ did not ask Plaintiff any questions.

## ALJ's Decision of December 22, 2005

The ALJ summarized the medical record and found that it established that Plaintiff had mild spondylosis and stenosis of the cervical spine, degenerative joint disease of the

lumbar spine, and minimal osteoarthritis of the hip.  The ALJ concluded, however, that the combination of these impairments did not meet the criteria for a deemed-disabling impairment listed in the Commissioner's regulations.  Accordingly, the ALJ proceeded to determine whether Plaintiff's combined impairments precluded Plaintiff from performing past work, or other work existing in the national economy in significant numbers, citing Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984), as setting out the relevant factors for this determination.  Id. at 18.

The ALJ reviewed Plaintiff's Function Report and hearing testimony and concluded that the medical evidence did not support Plaintiff's allegations "as to the intensity or persistence of his pain or its effect on his ability to work."  Specifically, the ALJ stated that Plaintiff's complaints of severe disabling back pain were not "totally supported" by the imaging and nerve conduction studies of September 2002, February 2003, March 2004, and August 2004.  Noting the references in the record to Plaintiff injuring himself lifting a large number of boxes in February 2002, picking up a rock in April 2004, using a power washer in April 2004, and lifting a heavy box in June 2004, the ALJ commented as follows:  "A reasonable person would find that, if the claimant's allegations of previous neck and back injuries were true, he would avoid unloading 500 pounds of boxes, picking up a rock, and using a power washer."  The ALJ accepted Dr. Gayle's opinion expressed in the November 2004 Medical Source Statement with regard to Plaintiff's physical

abilities and that Plaintiff "could perform work and was not totally disabled."[4]  Id. at 20.

The ALJ also pointed out that the record revealed no permanent, physician-imposed

functional limitations.  Id.

The ALJ acknowledged that Plaintiff had received a "modest amount" of medical

treatment, but pointed to the gap of more than one year, from February 2003 to April

2004, during which he did not see Dr. Toney, and the gap of nearly one year (presumably

from July 23, 2003, to April 27, 2004) during which Plaintiff did not see Dr. Gayle.  The

ALJ found that Plaintiff's testimony was further impugned by several contradictory

statements Plaintiff had made during the application process and to his doctors, for

example, telling Dr. Calhoon in October 2002 that he had graduated from high school,

while indicating "in his application and during the consultative examination" that he had

only completed ninth grade.  The ALJ observed that Plaintiff told Dr. Toney in February

2002 that he was working three jobs; that Plaintiff must have been employed in July 2003,

when Dr. Gayle placed him on light duty for one week; and that Plaintiff indicated in July

2004, when he was fitted for the orthotics, that he was self employed.  Id. 20-21.

---

[4]     As noted above, Dr. Gayle opined in this statement that Plaintiff could lift and/or
carry ten pounds frequently and 20 pounds occasionally; stand and/or walk continuously for
30 minutes; stand and/or walk for four hours in an eight-hour workday; sit continuously for
two hours (without breaks) and for six hours (with usual breaks) in an eight-hour workday;
push and/or pull (including operation of hand and/or foot controls) with limitation;
occasionally climb, balance, stoop, kneel, crouch, and crawl; and frequently reach, handle,
finger, and feel.

The ALJ noted that Plaintiff's poor work history "was not particularly helpful" to Plaintiff's credibility. Furthermore, the fact that Plaintiff received unemployment benefits for the fourth quarter of 2004 and first quarter of 2005 suggested that he was able to work at the time he applied for disability benefits, as Missouri law required that a person must be able to work in order to receive such benefits. Id. at 21. The ALJ stated as follows:

> Based on the evidence as a whole, not just the objective medical findings or personal observations, the [ALJ] does not find the allegations of debilitating pain credible. [Plaintiff's] use of treatment and medication, the objective medical findings, his activities, including work activity after his alleged onset date, his appearance and demeanor, and his treating doctor's medical source statement clearing him for work with limited, i.e., light, restrictions are inconsistent with his alleged complaints.

Id.

The ALJ concluded that Plaintiff had some symptoms limiting his ability to work, but not symptoms that precluded all types of work activity, and that Plaintiff had the RFC to occasionally lift ten pounds, to sit a majority of the work day with some walking and/or standing, and to perform repetitive hand-finger actions, such that he could perform the full range of sedentary work.[5] The ALJ determined that Plaintiff could not return to any of his

---

[5]    Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

> "Occasionally" means occurring from very little up to 1/3 of the time, and would generally total no more than about 2 hours of an 8-hour workday.

(continued...)

former jobs, and recognized that the burden shifted to the Commissioner to show that there were other jobs existing in significant numbers which Plaintiff could perform. The ALJ applied the Commissioner's Medical-Vocational Guidelines ("Guidelines"), 20 C.F.R. Pt. 404, Subpart P, Appendix 2, Table No. 1, Rules 201.24, 201.25, and 201.26, to Plaintiff's vocational factors (age, education, work experience), resulting in a finding that Plaintiff was not under a disability, as that term is defined by the Social Security Act.[6]

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial

---

[5](...continued)
Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

[6] Table No. 1 applies to claimants who are limited to sedentary work; Rules 201.24, 201.25, and 201.26 apply to claimants aged 18 through 49, with a limited, or less, education, and no transferable work skills.

evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'"  Id.  (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423 (d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

## ALJ's Finding that Plaintiff Did Not Have a Listed Impairment

Although Plaintiff argues that the ALJ erred in finding that Plaintiff did not have a deemed-disabling impairment listed in the Commissioner's regulations, Plaintiff does not identify any listing that he meets, or medically equals.  Nor does the Court's review of the record suggest any such listing.  Accordingly, the Court concludes that this argument is without merit.

## ALJ's Credibility Determination

Plaintiff also argues that the ALJ applied an improper standard when assessing Plaintiff's pain, and failed to give appropriate weight to Plaintiff's subjective complaints. Specifically, Plaintiff argues that the ALJ improperly required objective evidence of pain. In Polaski, 739 F.2d at 1332, cited by the ALJ, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  The ALJ must also consider "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions."  Id.

An ALJ is not required to specifically discuss each Polaski factor as long as the analytical framework is recognized and considered.   Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).  "A

disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although "an ALJ may not disregard a claimant's subjective pain allegations solely because there exists no evidence in support of such complaints . . . an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); see also Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) ("an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary").

Here, the ALJ recognized the correct standard for assessing allegations of pain, and applied that standard properly to the evidence. Based on a review of the medical record, the Court finds that the ALJ did not misread or misrepresent the record. As the ALJ noted, the MRIs and physical examinations of Plaintiff did not provide objective evidence of disabling pain. Also, as the ALJ noted, Dr. Gayle opined on November 23, 2004, that Plaintiff was limited to light work, and not that Plaintiff could not work at all. Dr. Gayle was a treating physician whose opinion the ALJ correctly accorded great weight, as it was not inconsistent with other evidence in the record. See 20 C.F.R. §404.1527(d)(2).

Further, the examining and treating physicians' notes in the record do not indicate that any other physician placed any functional limitations on Plaintiff. The ALJ properly took this into account as a factor that was inconsistent with Plaintiff's allegations of disability. See Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).

In not crediting Plaintiff's allegations of disabling pain, it was also appropriate for the ALJ to consider Plaintiff's receipt of unemployment benefits during the period in which Plaintiff claimed he was disabled.  See Schmidt v. Barnhart, 395 F.3d 737, 745-46 (7th Cir. 2005); Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998) (stating that although acceptance of unemployment benefits does not on its own negate a disability claimant's credibility, the ALJ may take the matter into account in making a credibility determination).  As is true in many disability cases, there is no doubt that Plaintiff experiences pain; "the real issue is how severe that pain is."  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Here, at the very least, the evidence of record would allow reasonable minds to differ as to the severity of Plaintiff's impairment, requiring deference to the ALJ's conclusion.  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Pelkey, 433 F.3d at 578-79 (holding that the ALJ's decision that the plaintiff, who had degenerative disc disease of the cervical and lumbar spines, could perform light work was supported by substantial evidence).

**Failure to Obtain Testimony from a VE**

Plaintiff argues that the ALJ erred in relying upon the Guidelines to determine that Plaintiff was not disabled, without obtaining the testimony of a VE to identify specific jobs that Plaintiff could perform.  As noted above, an ALJ may rely on the Guidelines when a claimant can perform the full range of work in a particular category of work. Here, the ALJ's conclusion that Plaintiff's impairments did not significantly limit his

ability to perform the full range of sedentary work is supported by substantial evidence in the record. Thus, the testimony of a VE was not required. See, e.g., Thompson v. Astrue, 226 Fed. Appx. 617, 621 (8th Cir. 2007) (holding that ALJ was entitled to rely on the Guidelines rather than obtaining testimony of a VE, notwithstanding claimant's alleged nonexertional impairments of obesity and pain, where ALJ noted claimant's obesity, which was not claimed as a disabling impairment, and ALJ's determination that these impairments would not interfere with claimant's ability to perform the full range of sedentary work, was supported by the record); Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir. 1995).

## CONCLUSION

The Court concludes that the Commissioner's decision that Plaintiff is not disabled was based upon substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised that they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 30th day of January, 2008